DECEMBER TERM, 1841.

WILLIAM N. MERCER, ADM'R OF B. FARRAR, DECEASED, *v.*
THEODORE STARK.

A court of mere errors and appeals cannot take original cognizance of a bill of review.

A bill of review can only be filed in the court in which the original decree, sought to be reviewed, was made.

If a bill of review is sustained, in a case which, when decided, was ready for final hearing, but in which the court erred in rendering the decree merely, the whole case is not thereby reopened, but the Court will only correct the error in the decree, so as to make it conform to the law.

If a bill of review is sustained because the case, when submitted, was not in a proper attitude for final hearing, then the whole case is open for re-examination.

To enforce a specific trust upon real estate, from loose and equivocal expressions, made by one of the parties, in mere social conversations, held at different times, would be inequitable, and contrary to the spirit and policy of the statute of frauds.

The existence of an express trust, necessarily excludes the idea of an implied trust, in relation to the same thing.

IN the year 1828, Wm. N. Mercer, administrator of B. Farrar, deceased, filed his bill to foreclose a mortgage given by defendant to Farrar, dated October 19th, 1824, upon a tract of land on the waters of Bayou Sarah, in Wilkinson county, containing 2000 acres (the title to which was then in controversy between the heirs of Robert Stark and James Mather), to secure the payment of a promissory note for $5000, with interest thereon at 10 per cent. per annum, from the 1st day of March, 1821, until paid, said note bearing date 31st of May, 1821, or 1825.

Stark filed his answer on the 22d of February, 1830, and admitted the execution of the mortgage and note, except that the date of the note was mistaken, and stated, that, at the period of the execution of the mortgage, the defendant was pressed with executions amounting to about $7000, and that Farrar, to relieve him from his embarrassment, agreed to purchase his real and personal property under said executions, which are specified in exhibit 1, to the bill; that Farrar agreed to purchase and hold said estate for the use and benefit of said defendant, and that he would

not sell the land for less than $8000. That, for ten of the slaves levied on, he would allow defendant $100 per annum, clear of all expenses, for each of said slaves, and restore them to the defendant when the debt due on said mortgage, and the debt about to be contracted in the purchase under the executions, should be paid. The answer of Stark set out at great length, and with particularity, the further agreement between himself and Farrar, but it is not deemed necessary to give any more detailed statement of it.

Stark states, also, that in pursuance of this agreement, Farrar purchased said property through the agency of James R. Cook, who took the title in his own name, but as defendant ; believed as agent only, and to carry into effect the stipulations referred to : that Farrar took possession of the property, and after his death, said Cook, at the instance of Mercer, Farrar's administrator, sold the real estate to James A. Gerault, the bargain having been made between Mercer and Gerault previous to giving the deed, and Gerault having notice of the equitable claim of the defendant. That said land and slaves, mentioned in exhibit 1, sold at a great sacrifice at the time, from an idea prevailing at the time, that the property was to be purchased in for defendant's benefit.

This answer was made a cross-bill, and prayed that an account might be taken of said real and personal estate, and of the hire of said negroes, and the agreement specifically executed, and the benefit of the agreement allowed defendant, by way of offset to the mortgage debt, and a decree for such balance as might be found due him.

W. N. Mercer answered the cross-bill July 6, 1830, and denied all knowledge of the agreement, and denied the execution by him of any parts of the agreement, and stated that the land was sold on a credit to James A. Gerault, for 7 or $8000.

J. A. Gerault's answer was filed July 6, 1830 ; he denied the agreement from his entire ignorance of it ; states that Farrar, some time after the sale, offered to sell to him for $6000, and stated to him, Stark, or his relation, had made proposals to purchase at $5000 ; that though he was a friend to Stark, he had suffered enough, and desired to get rid of the application, and that he purchased to secure himself ; that he, Gerault, gave $7500, payable in two annual

instalments with interest ; that he purchased in 1825, without any knowledge whatever of Stark's claim.

On the 19th February, 1829, Carter Beverly's deposition was taken : he stated, that Farrar was his son-in-law : that he had many conversations with Farrar, about his purchase of Stark's land and slaves. He uniformly stated, he· purchased to save the claim he had against Stark ; he purchased with no view of availing himself of any kind of advantage whatever of him, and that it was perfectly understood between them, that Stark was at liberty to redeem them at any time ; and, in case of his failing to do so, any sale or sales of the property bought by him, over and above his claim, was fully and fairly intended to go, and should go, to the future benefit of the said Stark ; that they were mutual friends, and his object was to serve him all he could. That he frequently told witness, there was a full understanding between the defendant and himself as to the precise terms upon which he purchased the land, repeating to him, as often as he spoke of it, that in any sale he might make of it, he intended and would certainly pay over the surplus to Stark, believing, as he did, that it would command a greater price than he gave for it. That Stark well knew he would take no advantage of him. Stark, said he, poor fellow, has been unfortunate, and has, I know, full confidence in me, and I have neither the disposition to deceive him, or any view whatever of benefiting myself to his prejudice, by any disposition I may make of his property. I am fully convinced, I shall sell it for much more than I gave for it. The precise amount he would ask for it, even in the event of sale, the witness did not recollect.

It is not necessary to the proper understanding of the opinion of the Chancellor, to give at greater length the evidence of Beverly, or notice that of the other witnesses.

Upon the bill, answers, cross-bills and answers, and the various exhibits and proofs in the cause, the case was submitted to the judges of the old Supreme Court, for the reasons given in the Chancellor's opinion. They gave a final decree in the case, and sent it back to the Chancery Court.

Stark afterwards filed, in the old Supreme Court, a bill for a review of that decree ; which was decided by the High Court of

Errors and Appeals, after its organization under the new constitution. They sustained the bill for a review.

Their opinion, and the report of the case (*Stark* v. *Mercer*), is to be found, 3 How. Rep. 337.

The review of this decree of the old Supreme Court having thus been ordered, the cause came on again for trial, before the present Chancellor, and was once more submitted for final decree.

*M'Murran*, for complainant Mercer.

Complainant contends that this Court will confine itself to the error which the High Court has decided to exist, and to that alone. But if the Court will review the whole cause, from beginning to end, I am prepared to enter upon it.

There is no difficulty as to the debt due Mercer's intestate, and the mortgage sued on ; Stark admits it. But the questions grow out of the defence set up by way of answer and cross-bill ; that complainant's intestate was to allow Stark to redeem other land and negro slaves, purchased by the former at a sale of Stark's property under execution.

Now our first answer to this, is, that the proof does not make out this statement. It is positively denied by Mercer and Girault, in answer to Stark's cross-bill, and the evidence wholly fails to establish it ; and Beverly's long "rigmarole" is indefinite and contradictory, and does not, from beginning to end, state that the purchase by Farrar constituted a part of the consideration or inducement that moved Stark to execute the mortgage on other land to Farrar, and which Stark makes as a part of the *res gesta*, but which is unsupported by any proof.

But, admitting that such an agreement as stated were proved, and could be made available in a court of law or equity, how can it be set up as a defence in this suit ? It is distinct, and has nothing to do with it. Stark blends the two transactions in his answer and cross-bill ; but this is denied by Mercer and Girault, and is unsupported by a tittle of proof. Then such a defence must fall to the ground, for this reason. If I instituted a suit to foreclose a mortgage, could the mortgagor set up that he was authorized to redeem other property, by way of defence ? It would require a distinct original proceeding by bill on his part.

But again, admitting that there is an agreement, it is void, and cannot be enforced, for two very obvious reasons.

1. There is no consideration to support it.

2. It is in violation of the statute of frauds.

Where is the tittle of consideration in the testimony, that Stark was to pay or make good to Farrar ? Will it be said that Stark was to pay out of the property, the money Farrar paid for it ? or that he had to pay it up before he redeemed it ? This is no consideration at all. Besides, was Stark bound to do this ? was there a mutual agreement mutually obligatory ? could Farrar enforce Stark to redeem ? &c. No. It will not work both ways. It was a *nudum pactum.* 4 John. Rep. 235.

So it is equally in violation of the statute of frauds. Rev. Code, 192 ; 5 Cow. Rep. 162 ; (*Van Austine* v. *Wimple*) 6 Vesey, 662. And this authority shows that there can be nothing like a resulting trust here : that can only arise where a party has made a purchase with the money of another. See 2 John. Ch. Rep. 409, directly in point. See Walker's Rep. 451, where this cause was fully decided, and that upon correct principles.

Where past performance is relied on, the proof must be clear and distinct, &c. 1 John. Ch. R. 132.

*Winchester,* for defendant Stark.

The case of *Boyd* v. *McLean*, 1 John. Ch. Rep. 591, is a strong case in favor of defendant Stark. It is like this in almost all its features.

Boyd, the complainant, claimed upon the ground, that the land was paid for by 1500 dollars borrowed from McLean, the defendant, and that McLean took the title from Calden, the vendor, in his own name, the better to secure the payment of the money loaned.

The proof was, that in 1802, Ross, as agent for defendant, agreed with complainant, that defendant would lend him 1500 dollars, and that the deed should be executed to defendant to avoid some judgments that might have the preference to a mortgage ; and that defendant only wished the money secured, and it might rest for two or three years : confessions of defendant proved the fact of the loan, and of the taking of the deed in his own name, the better to secure the money.

In 1809, '10, and '12, declarations, that he wished to take no advantage of the plaintiffs, and wished to save them the lot, and entered into the business to oblige them, were proved. The defendant denied the loan, and any contract on the subject. He admitted a parol observation, that if he would repay the 1500 dollars, he would let him have the land. Ross, so far as he acted as agent, denied the loan, or contract ; and the Court held, under the facts, the complainant entitled to the relief he asked.

Upon the similar proof in this case, to be found in the record, a similar decree should be given.

CHANCELLOR.   On the opening of this cause, it struck me on the very threshold of the argument, that the steps heretofore taken in it placed it in a posture, at once novel and embarrassing, as to what further action, if any, should be taken by this Court. The subsequent reflection which I have bestowed upon the case, has served to strengthen, rather than remove my first impression. The case was originally instituted in the Court of Chancery existing under the old constitution. One of the original counsel having been elevated to the Chancery bench, pending the case before that court, it was transferred, according to the provisions of a statute upon that subject, to the then existing Supreme Court, whose duty it was made to decide the case, and certify their decision back to the Court of Chancery, to be entered as the final judgment of that court.

The Supreme Court proceeded to pronounce an original decree, foreclosing the mortgage, and directing a general execution for any balance that the mortgaged property might fail to bring ; which decree was certified to the Court of Chancery. The defendant afterwards filed his bill of review, alleging various errors in the decree, which was placed upon the docket of the then Supreme Court.

Thus things stood until after the adoption of the present constitution, creating the High Court of Errors and Appeals, and declaring that it should "have no jurisdiction but such as properly belongs to a court of errors and appeals." The bill of review was then taken up by that tribunal, and sustained, reversing that portion of the decree authorizing execution generally, and remanding the case

to this Court for further proceedings. It is not pretended, that this decision was given by that court in its appellate character. What influence that decision is to exert over the case in its present situation, has been to me a. question of exceeding delicacy and embarrassment. That jurisdiction of a bill of review does not belong to a tribunal having mere appellate jurisdiction, is, I think, perfectly clear. Bills of review are classed, by Lord Redesdale, as bills in the nature of original bills. Mit. Pl. 122, (3d Am. ed.) If this is their true character ; if they partake of the nature of an original bill in chancery, it would seem difficult to sustain the jurisdiction of a court, that is declared to " have no jurisdiction but such as belongs to a court of errors and appeals." The proceeding on a bill of review is aptly distinguishable from that on an appeal, in this : a bill of review is to be heard before the same judge or jurisdiction, that gave the decree which is sought to be reviewed ; whilst an appeal is the transfer of a judgment or decree of an inferior, to a superior tribunal, the latter having the power of revising and correcting the proceedings of the former. It is obvious, that the case was not before the High Court of Errors and Appeals, by writ of error or appeal, and yet these seem to be the only channels through which a cause can be constitutionally transferred to that court. The old Supreme Court, that gave the decree to which this bill of review was filed, took cognizance of the case as a court of chancery, exercising original jurisdiction. The decree, in legal contemplation, stood, therefore, as though it had been pronounced by the Chancellor himself, presiding in equity. Would the High Court of Errors and Appeals entertain original jurisdiction of a bill of review to a decree pronounced by this Court ? Surely, they would not : and yet, I am persuaded it would be difficult, on principle, to distinguish the one case from the other. Indeed, I understand that court has decided, that they could not take jurisdiction of the cases remaining on the old Supreme Court docket, which had been transferred there under the statute referred to: their jurisdiction being more restricted by the constitution, than was that of the former court. This decision would seem to be conclusive against the jurisdiction taken by that court in the present case. The questions, whether a bill of review was in the nature of an original bill, and whether original

jurisdiction of it did not belong exclusively to the same jurisdiction that gave the decree, do not seem to have been raised in the reported arguments of counsel, nor adverted to in the opinion of the Court on the bill of review. If the attention of that court had been directed to these questions, I am persuaded there would have been no doubt of the result. But that court having entertained jurisdiction of the bill of review, after reversing the decree for a mere error in law apparent upon the face of it, nothing remained but for them to correct the error, and give the decree its proper legal character. The case having been transferred from this Court by operation of law, it could only be returned here with a final decree for execution, and not for any new decree by this Court.

It does not necessarily follow, upon sustaining a bill of review for error apparent upon the face of a decree, that the whole case is opened up, for examination *de novo*. Where a case is ready, in all its features, for a final decree, and the Court commits some error in rendering that decree, it should, upon sustaining the bill of review, proceed at the same time to correct the error, so as to make the decree conform to the law of the case. If, however, the error complained of arises from the fact that the case was not in a proper attitude for final hearing, and a bill of review is sustained, then the whole case is open for reëxamination. These views of the practice upon this subject may be thus illustrated : — Suppose a decree rendered against an infant, without giving him a day to show cause against it ; for this error it would be reversed, by a bill of review ; but the case would not thus be opened for a general rehearing ; the Court would, by the same sentence which declared a reversal of the decree, proceed to correct the error complained of. On the other hand, if a decree by default was rendered against an infant, and this fact appeared, it would be error, for which a bill of review would lie; and in that instance, the case would stand open for further proceedings ; because something would have to be done by the parties, to put the case in an attitude for final hearing. Upon a bill of review for error on the face of the decree, no investigation on the merits can take place, not even though the matters decreed are contrary to the proofs in the cause. *Milish* v. *Williams*, 1 Vernon, 166. In the language of Lord Eldon, " the question is not, whether the cause is

well decided, but whether the decree is right or wrong upon the face of it." *Perry* v. *Phelps*, 17 Ves. 178. In a cause, then, where the decree is reversed for error on the face of it, and where no further proceedings are required in order to a final hearing, the Court should at once correct the error, and let the decree, thus corrected, stand as the final decree of the Court. These reflections have led me to doubt whether I could take any further cognizance of the case, but as the counsel on both sides seem tacitly to have conceded that the case was properly here, I am induced (but not without great distrust of its propriety) to attempt some proper disposition of the case. It must be to make such decree, as the original one made in the cause, subject to the correction for which it was reversed. I am the more inclined to this, because satisfied with the conclusion to which the old Supreme Court came.

The testimony is extremely imperfect and unsatisfactory. There is no one of the witnesses who attempts to prove the distinct existence of any contract or agreement, as being made and agreed upon between Stark and Farrar, either at or before the purchase made by Farrar. The whole testimony upon the subject rests upon the vague declarations of Farrar, made in casual conversations, held with some of the witnesses. Indeed, those witnesses, whose relation to the parties at the time of the transaction gave them the best opportunity of knowing its character, say they heard nothing of any such contract, agreement, or trust, as the one attempted to be set up by the complainant. The testimony of Beverly proves, that Farrar " uniformly told him that he bought them (the land and negroes) for the purpose of saving the claim he had against Stark."

To the second interrogatory, he says, that Farrar " told him that it was perfectly understood, that Stark was at liberty to redeem, at any time, if he could ; and if not, the proceeds of any sale of the property, over and above his claim against Stark, were fully intended to go to Stark's future benefit." With all the affected minuteness of this deposition, its vagueness and generality are strikingly illustrative of the danger of admitting this kind of testimony to set up and establish a trust in relation to real estate. When was it " understood that Stark was at liberty to redeem, at any time, if he could ?" Did this understanding take place before, at, or after

the sale ? and was it the purpose and inducement with Farrar, in making the purchase ? This same witness says, that Farrar uniformly told him, that he purchased the land and slaves to save a claim he had against Stark. Does this testimony sustain the statement of the defendant's answer, that the purchase was made " solely" for his benefit, and to be held for his use ? To enforce a specific trust upon real estate, from such loose and equivocal expressions, made by one of the parties, in mere social conversations, held at different times, would be inconsistent, not only with the spirit and policy of the statute of frauds, but with the general rules of evidence. It is necessary that the parol declarations of a trust should be clear and unambiguous, before the Court can change the absolute nature of a conveyance, and decree the execution of a trust, not expressed in the deed. *Slocum* v. *Marshall*, 2 Wash. C. C. R. 398.

It is not the case of a complainant alleging a particular state of facts, from which he is attempting to set up and establish a resulting trust, as a conclusion of law. Trusts are either express or implied. The one arising from contract, fixing and defining its terms, the other from implication of law, upon the presumed intention of parties. The existence of an express trust necessarily excludes the idea of an implied trust, in relation to the same thing. A resulting trust is the mere creature of equity, and cannot arise, therefore, where the parties have declared an express trust. *Peggett* v. *Dubois*, 5 Paige, 114.

It has been attempted to assimilate this case to that of the purchase-money of a tract of land being paid by one person, and the title taken in the name of another ; but there is no evidence to prove in this case any loan of money by Farrar, or anything approaching it.

Let a decree be prepared, directing a foreclosure and sale of the mortgaged premises.